## KING PIN FOOD MARKET, Inc., et al. v. SCHNELL.

District Court, S. D. New York.
April 29, 1941.

Greenbaum, Wolff & Ernst, of New York City (Jerome Handler, and Theodore S. Jaffin, both of New York City, of counsel), for plaintiffs.

Joffe & Joffe, of New York City (Joseph Joffe and Max Apfelbaum, both of New York City, of counsel), for defendant.

DAWKINS, District Judge.

King Pin Food Market, Inc., and the trustee in bankruptcy of Ben Kosmin and Son, a partnership, citizens of Pennsylvania, sued Harry Schnell of New York, alleging that the latter had entered into a contract with Ben Kosmin to form the plaintiff corporation, and bound himself to take $10,000 of stock therein, and, in addition, to lend it another $10,000; that the defendant had breached both obligations by refusing and failing to contribute anything to the capital of the corporation, and as a result, it was forced to liquidate after operating about a month. The demand by the corporation was for the payment of the alleged subscription and by the Trustee for damages claimed to have been suffered by Kosmin through the forced liquidation of the company for lack of capital.

■ Defendant denied that any agreement was consummated, and, as an affirmative defense, alleged that the parties had, by mutual consent, abandoned the matter. The evidence is in sharp conflict. The burden, of course, is upon plaintiffs to prove by a fair preponderance of the evidence, first, the consummation of the agreement, and secondly, the alleged damages.

It is not disputed that Kosmin had, prior to the latter part of October, or early November, 1938, been attempting to induce defendant to join in the establishment of a super market in Collingsdale, Pennsylvania. Several drafts of the proposed agreement, the exact number not definitely appearing in the record, were prepared and correspondence ensued between defendant, Kosmin and the latter's attorney, Curran. Finally, about November 21, 1938, Schnell signed in duplicate the document identified in the record as Plaintiffs' Exhibit No. 1, which will appear as a footnote. It was undated, but forwarded to Kosmin with a letter bearing the said date of November 21st, in which defendant requested that Kosmin sign both and return one copy. It is from this point on that the evidence is in sharp conflict.

In the meantime, the attorney whom Kosmin had evidently selected to represent the proposed corporation had prepared an application for a charter, which was sent to and signed by Schnell some time prior to November 5, 1938. It provided an authorized capital of 200 shares "without par value", but with "the stated capital applicable to which shall be twenty thousand dollars ($20,000)". It was also provided that the stock "may be issued from time to time by the share holders or board of directors." The amount of paid in capital was stated as $500. It also named "the first directors" as Ben, Milton and Bertha Kosmin on the one part, and Harry, Samuel and Seymour Schnell on the other part. The incorporators were declared to be Harry Schnell, Ben and Milton Kosmin, who subscribed one share each and signed the articles of incorporation. It was acknowledged before a notary by Ben and Milton Kosmin only, on November 5, 1938. It had previously been signed by Schnell,

who transmitted it with a letter to Ben Kosmin dated November 4th, in which it was stated "I have duly signed". The certificate of incorporation by the Secretary of State of Pennsylvania was issued on November 10, 1938. With his letter of November 4, 1938, returning the articles of incorporation, Schnell stated he was also "returning the agreement (meaning the proposal with respect to the formation of the corporation, contributions, of capital, etc.) as per our conversation, please note the following suggestions for change":

"No. 7. The loan to the corporation is to be made by note with interest not to exceed 5% per annum, for a period of time as deemed necessary by both the President and Treasurer.

"No. 9. That the corporation shall agree to pay Ben Kosmin & Son, $150.00 per week for services rendered in supervising and managing the market and for hauling and deliveries by their trucks. This sum is subject to adjustment as deemed by the President and Treasurer.

"No. 10. All contracts obligations and purchases shall have the approval of the President and Treasurer.

"Kindly have these corrections made on your copy and my copy and return to me. Also please send me signature cards from the bank you intend to use."

This had been preceded by a letter of Albert G. Curran, the attorney selected to handle the legal matters of the proposed corporation, dated November 2, 1938, addressed to Ben Kosmin, stating that the articles of incorporation were enclosed and should be signed by Ben and Milton Kosmin "and then forwarded to New York to be signed by Harry Schnell"; and also enclosing "agreement re: incorporation, which you will also please sign and send to New York after having executed it yourself". No letter was produced from Kosmin to Schnell forwarding these documents, although it seems to be conceded that the articles of incorporation and the proposed agreement were sent by mail. However, on the same date that Schnell wrote Kosmin returning these papers with the letter of November 4th, quoted from above, Kosmin wrote Schnell saying "enclosed you will find agreement as you asked changed". It was also stated that signature cards for the bank account were enclosed and that these would have to be signed by each of the three Kosmins and Schnells, or six in all. There is nothing to explain how it

happened that these two letters, that is the one by Schnell and the other by Kosmin, were written on the same date or whether the "changed" agreement was prepared after the receipt from Schnell of the one returned with his letter of November 4th.

The next letter, in point of time, is from Curran to Schnell, dated November 16, 1938, enclosing by-laws and minutes for the first meeting of the King Pin Food Market, Inc., to be signed by the three Schnells, waiver of notice of the meeting of the board of directors, affidavit of paid in capital, etc. This letter also stated: "I am enclosing a copy of the reorganization agreement, which should be signed by Harry Schnell only." Curran asked that a check for $10,000 be returned payable to the corporation and advising that "Mr. Kosmin has deposited with me his check for $10,000." The writer also requested that if "there are any other matters which are not perfectly clear, I suggest that you call me on the phone * * *." Schnell on the following day, November 17th, wrote to Kosmin advising that he had received the letter from the attorney with enclosures, but stated that "there seems to be some misunderstanding of my letter of November 4th in reference to items No. 7 and No. 10. These two items were not in the agreement as I outlined in my letter". He advised that he was returning the agreement so that it could be corrected in accordance with the letter of November 4th as to items No. 7 and No. 10. "Just as soon as these are corrected, I will be able to sign and return all papers to you."

There is no letter in the record to show the return of the proposal to Schnell, but it is not seriously disputed that the revised document was sent to him by mail and then followed his letter of November 21st, quoted above, stating that he had signed both copies and asking that Kosmin also sign and return one copy to him, Schnell. Neither is there any written evidence of the signing and returning by Kosmin of the agreement to Schnell. It is true that the document sued on, Plaintiffs' Exhibit No. 1, bears Kosmin's signature. Kosmin swears that he signed and returned it to Schnell in person on the occasion of one of his periodical visits to New York. This is emphatically denied by Schnell.

The next written evidence is a letter by Schnell to Kosmin under date of November 28, 1938, reading as follows:

"In article No. 3, there should be notation of 100 shares each alongside of $10,000. for each of us.

"In articles No. 4 and 5, the directors and officers of the corporation shall be for 1 year only.

"In article No. 8, the terms and particulars of the leases should be stated.

"Another article No. 11 should be inserted with reference to keeping of the books. The books of the corporation should be kept separate and on the premises of the market.

"After the corrections have been made, I will sign again and return the old agreement to you."

On the same date that Schnell signed and sent the proposal in duplicate to Kosmin, the latter drew down the check for $10,000, which had been placed with Curran. This was explained by Kosmin as being necessary because Schnell had not put up a like amount and expenditures of large amounts had been made in remodeling and equipping the building. However, it is difficult to understand how it could be expected that Schnell would put up any money until terms of the proposal had been agreed upon.

It is conceded that, according to the calendar, November 17, 1938, was a Thursday, and if Schnell's letter was received in Philadelphia on the 18th and a reply was sent immediately, it would have arrived in New York on Saturday, the 19th, and been delivered either that day or the following Monday, because of the intervening Sunday. So that Schnell would have had the remainder of the day and until the hour of dictating his reply on Monday, the 21st, to consider the matter. His letter of the latter date saying he had signed both, requesting that Kosmin sign and return one copy, raised no further objection, and it was not until the letter of the 28th that any written evidence of communication between Kosmin and the defendant appears. It will be noted that this letter states that "since I usually take up all new matters with my bankers, I showed them copy of the *agreement* with you." Plaintiffs argued that inasmuch as according to Schnell's letter of the 21st, he had returned both copies to Kosmin duly signed, he could not have shown copy to the bankers until one had been received back from Kosmin and Schnell calls it an agreement instead of proposal. On the other hand, Schnell says that he had shown it to the banker, Meyers, between its receipt on Saturday, the 19th, and the writing of his letter of November 21st, but without waiting to hear from the banker, the document had been signed and returned to Kosmin; and that between that time and November the 28th, the banker had telephoned the suggestions referred to in the letter of the latter date.

Schnell testified that he had been unable to reach Meyers to testify in this case because he was in the military service, holding a commission as Captain. In the course of the trial, plaintiffs located Meyers, who was called and testified that while no longer connected with the bank, he was not in military service, although he had held a commission as Lieutenant in the last World War. Meyers also, on direct examination stated that he had no recollection of discussing the King Pin Food Market, Inc., with Schnell, but on cross-examination, said it was possible that he had and that on having his memory refreshed, he seemed to have some vague recollection of such a discussion, but could say nothing definite. It is admitted that no reply was made by Kosmin to Schnell's letter of November 28th. The latter swears, and is corroborated by his secretary and her assistant, as well as a brother, Louis Schnell, that Kosmin subsequently came into the office and informed Harry Schnell that he had found someone else, a butcher, who had $15,000 to put into the matter and if Schnell would lend him $5,000 to add to what he could raise to make $15,000, to match the butcher's contribution, Schnell could step out. They further testified that Schnell indicated his willingness to lend Kosmin the $5,000 and that this was subsequently consummated for that amount; that Schnell, in substance, asked Kosmin to return the document which he had signed and Kosmin's reply was that it had acquired no effect since he, Kosmin, had not signed it. It is not disputed that Schnell did make Kosmin the loan and the letters enclosing the note and transmitting the check as well as the cancelled voucher were put in evidence, and there is no question but that Schnell loaned Kosmin the money.

As of November 16th, as earlier pointed out, Curran had prepared forms for the holding of the first meeting of stockholders, directors, etc., and had sent them to Schnell with the "copy of reorganization agreement", but admittedly, these were never signed by Schnell. This was of course prior to November 21st when Schnell finally signed the proposal. Thereafter on Janu-

ary 11, 1939, the attorney, Curran, prepared and mailed to Schnell forms for the resignation of all of the Schnells as directors of the corporation. This letter makes no reference to the circumstances which led up to its writing, but evidently due to something that had happened in the meantime, it appears to assume that Schnell knew the reason why the request was being made.

Schnell says that he heard nothing further from the matter until he received a letter from attorneys under date of March 31, 1939, after the business of King Pin Food Market, Inc., had been closed and sold to the Giant Tiger, another corporation in which the relatives of Kosmin held a substantial, if not a controlling interest. Schnell calls attention to the fact that Kosmin's note for $5,000 was to mature on April 3, 1939, just a few days later, and contends that this demand was made as an afterthought and was in anticipation of default in payment by Kosmin. Another significant circumstance is the fact that while the resignations by the Schnells as directors were not sent to them until January 11, 1939, and were only returned on the 13th, the first meeting of the stock holders and directors purports to have been held on January 3, 1939. These minutes are recorded on the corporate records and recite that the stockholders appearing were Ben and Milton Kosmin, each holding one share "a majority". Forms of by-laws were presented and "unanimously adopted". The minutes also recite "the resignations of Harry Schnell, Samuel Schnell and Seymour Schnell as directors to the corporation were presented and upon motion accepted." It must be remembered that these resignations had not been sent to the Schnells for signing until eight days later and were mailed back by Schnell on the 13th, some ten days after the purported corporate meeting. The resignations, according to Schnell's witnesses, were undated, but there is written, apparently on another typewriter, the date of January 3rd.

All of these things took place long before the business was opened on January 24th and they tend to corroborate rather strongly the statements of Schnell and his witnesses to the point that Kosmin and Schnell had agreed that the latter should not go forward with the matter, but that someone else would take his place. Of course, inasmuch as Schnell had already signed the agreement on November 21st, without further question, and returned it to Kosmin, if the latter as a matter of fact had signed and mailed it back or so advised Schnell within a reasonable time, then the subsequent advice of his banker or other reasons for changing his mind would be of no avail. But the question is did Kosmin sign and return the documents to Schnell as he swears?

Strange to say, it appears that all the other communications on the subject were by mail, although in one or more instances, there does not appear to have been accompanying letters. On the other hand, since Kosmin and his attorney had finally drafted the proposal which Schnell was willing to sign, it is difficult to understand why Kosmin would not be willing to sign himself and return the copy to Schnell. The record indicates that, notwithstanding the great difficulty in agreeing upon terms, and Kosmin's statement that he was continually urging Schnell to go ahead with the matter, he, Kosmin, had rented the building and was going ahead with its remodeling, etc., late in October and early in November, some two or three weeks before Schnell signed the proposal. It is also true that Schnell indicated a purpose of going through with the deal by signing the articles of incorporation about November 4th and carrying on correspondence dealing with the final draft, which he signed. On the other hand, why did Kosmin make no reply to the letter of Schnell of November 28th, and why did he, notwithstanding his statement that he was continually calling on Schnell to put up his share of the money and the latter's statement that he would have to sell a mortgage note to do so, with such apparent ease make the loan of $5,000 from Schnell to the firm of Ben Kosmin & Son on about the same date that the first meeting of stockholders and directors purports to have been held on January 3, 1939. Two letters passed between them, that of Schnell enclosing his check for $4,925, proceeds of Kosmin & Son's note under date of January 3rd, and the latter replied January 17th. These letters contain expressions that are significant on the issue of mutual abandonment of the proposal that Schnell participate in the corporation. Schnell, in forwarding the check, among other things, said: "We want to take this opportunity to wish you every success in *your* new undertaking", and Kosmin replied, "We hope that your very good wishes will be fully realized when this market is opened *by us* and want to take this opportunity to tell you that at any time we can

be of service to you in any manner, please call on us and we will be happy to do so."

As further evidence of the idea that Kosmin and Schnell had agreed that the latter should withdraw, on January 24, 1939, before the business had opened, Kosmin signed a credit statement in applying to the Bank for a loan for the corporation of $2,-500 for fifteen months. As of January 19th, he listed assets of $38,843.22, and liabilities of the same amount, including accounts payable of $7,269.18, "lease payable-equipment" $10,964.19, with capital stock of $20,000 and $609.85 surplus. He gave himself as "President and Treasurer" and his son, Milton, as "Secretary" although, according to the alleged agreement, Harry Schnell was to be treasurer. It recited that he, Kosmin, held 55 shares and his son 30 shares, and that the "total shares issued" were "200". The officers names were in accordance with the minutes of January 3rd, 1939. Schnell was not shown to have any connection with the company, but Kosmin explained this was because Schnell did not want to be known in the matter.

A formal printed invitation to the opening of the store was sent Schnell, the same as the general public.

If Schnell still had an interest in the new company, it does seem that he would not have referred to it as *"your* new undertaking" and that Kosmin, instead of saying "when this new market is opened by *us",* would have used some expression indicating that it was a business in which he and Schnell were mutually interested. Kosmin's letter was signed with the name of his firm, Ben Kosmin & Son.

█ If the document, Plaintiffs' Exhibit No. 1, had been signed at one time by both parties, then the mere proof of its execution would have been sufficient to throw upon defendant the burden of showing its legal abrogation. However, it is admitted that it had not been signed by Kosmin when it was sent to Schnell for signing, and the plaintiffs must prove by a fair preponderance of the evidence that he not only signed, but that he returned or communicated the fact back to defendant within a reasonable time. The stories of the several witnesses, it seems to me, are about on a par, as to their reasonableness, and that of defendant, has at least a preponderance of numbers in his favor. This, plus the subsequent conduct of the parties indicating that Schnell had withdrawn from the matter, as evidenced by the corporate minutes, etc., I think at least carries such weight that the plaintiffs have not discharged the burden of proving their case by a fair preponderance of the evidence and there should be judgment for the defendant.